IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Chem-Nuclear Systems, L.L.C.<br>a Delaware limited liability company,<br>Duratek, Inc., and Duratek Services, Inc., | )<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | C/A No. 3:03-441-22<br>(relates to Dkt No. 194) |
| v. | )<br>) | **Order and Opinion on Defendants'** |
| James Braun, Tracy Barker,<br>Kelly McCurry, Sharra Arnold,<br>Carl Rowland, Cam Abernethy, and<br>Mike Mohundro | )<br>)<br>)<br>)<br>) | **Motion for Partial Summary Judgment**<br><br>(re claims for breach of non-competition<br>provisions of the Individual Defendants'<br>employment agreements and state law |
| Defendants. | ) | tort claims against all Defendants) |
| Chem-Nuclear Systems, L.L.C.<br>a Delaware limited liability company,<br>Duratek, Inc., and Duratek Services, Inc., | )<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | C/A No. 3:03-441-22<br>(relates to Dkt No. 188) |
| v. | )<br>) | |
| AVANTech, Inc., a South Carolina<br>Corporation | )<br>)<br>) | |
| Defendant. | ) | |

These matters are before the court on Defendants' joint motion for partial summary judgment. Specifically, the seven Individual Defendants named in the first action captioned above (CA No. 3:03-441-22), move for summary judgment on claims that they breached certain terms of their employment agreements with Plaintiff Chem-Nuclear Systems, LLC ("CNS, LLC") or a predecessor thereto. They also seek a ruling that they are not liable on related tort claims for conversion, civil conspiracy, and intentional interference with prospective contract. Defendant

AVANTech, named in the second action captioned above (CA No. 3:03-442-22), seeks a ruling that it is not liable on state law tort claims mirroring those addressed in the Individual Defendants' motion.

As to the contract based claims, the Individual Defendants argue, *inter alia*, that they are not in privity of contract with Plaintiffs, Duratek, Inc. ("Duratek") and Duratek Services, Inc. ("Duratek Services"). Thus, they argue that any competition with these entities did not breach the non-competition provisions of their employment agreements with CNS, LLC. These Defendants further argue that there is no evidence that they engaged in prohibited competition with CNS, LLC. They also argue that they cannot be liable for breach of a duty of good faith and fair dealing.[1] All Defendants argue, on both legal and factual grounds, that they are entitled to summary judgment on the three tort claims for conversion, civil conspiracy, and intentional interference with prospective contract.

For the reasons set forth below, the court concludes that Defendants are entitled to summary judgment on some, but not all, of the claims at issue in this motion. Specifically, the court grants the Individual Defendants' motion as to the third cause of action (breach of the non-competition provisions of their employment agreements). To the extent raised here, the court denies summary judgment on the fourth cause of action asserted against the Individual Defendants (breach of the

---

[1] Some language in the Individual Defendants' motion suggests they are also seeking summary judgment as to allegations that they violated the confidentiality provisions of their employment agreements. These allegations are not, however, addressed further in the present motion. By contrast, these allegations are the subject of a separate later-filed motion. Under these circumstances, the court does not construe the present motion to address the confidentiality provisions of the employment agreements.

confidentiality provisions of the employment agreements).[2]  The court also grants the motion as to that portion of the fifth cause of action (violation of the duty of good faith and fair dealing), which relates to the limits on competition.  The court limits the remainder of the fifth cause of action to claims based on the employment agreements' confidentiality provisions.

The court also grants the motion for summary judgment as to the conspiracy claim (seventh cause of action) in full and as to the conversion claim (sixth cause of action) in part.  The court denies the motion as to the claim for intentional interference with prospective contract (eighth cause of action) but limits the claim as set forth herein.

## STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts."  *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks

---

[2]  Because this claim is only mentioned and not argued in the present motion, this denial is without prejudice to any separate motion related to this claim.  *See supra* n. 1.

3

sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

Further, a party may not create a genuine issue of material fact by presenting two conflicting versions of events. *Barwick v. Celotex Corp.,* 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."). This rule applies equally to the testimony of non-party witnesses. *See Rohrbough v. Wyeth Laboratories, Inc.,* 916 F.2d 970, 974-77 (4th Cir. 1990) (affirming trial court's rejection of expert's affidavit testimony which contradicted his sworn deposition testimony).

## FACTS

Taken in the light most favorable to Plaintiffs, the central facts are as set forth below.[3] Defendants James Braun, Tracy Barker, Kelly McCurry, Sharra Arnold, Carl Rowland, Cam Abernethy and Mike Mohundro are all former employees of Plaintiff Chem-Nuclear Systems, LLC (CNS, LLC). Each of these Defendants signed one of two versions of an employment agreement during their employment with CNS, LLC (or a predecessor or related company). For purposes of this order, these agreements are presumed to be binding as between the Individual Defendants and

---

[3] Additional facts are addressed in the "Discussion" section of this order.

CNS, LLC.[4]  While the parties have referred to other agreements, no other agreement is relevant to the present motion.[5]

**Employment Agreements.**  While not identical, the two forms of employment agreement (referred to herein as Form A and Form B) contain similar non-competition provisions.[6]  The prohibitions on competition apply during employment and for one year thereafter.  While the particulars of the prohibited competition are limited in somewhat different ways in each form, both contain a limiting definition of the "companies" with which competition is prohibited.  *See infra* Discussion § I.  By contrast, the forms otherwise extend the protections of the employment agreement to CNS, LLC's then-parent corporation, Waste Management Inc., ("WMI") and to all of WMI's various "divisions, subsidiaries, or affiliates."

A summary of the forms signed and relevant employment dates for each of the Individual

---

[4]  All but one of the Individual Defendants signed their employment agreements while they were employed by Chem-Nuclear Systems, Inc.  That entity merged with CNS, LLC in 1996.  For purposes of this motion, these Defendants concede that, as sole survivor of the merger, CNS, LLC may enforce the employment agreements.  The remaining Individual Defendant, McCurry, signed his employment agreement while employed by an affiliated company.  McCurry, therefore, argues that any obligation not to compete with the affiliated company ended upon his transfer from the affiliate to CNS, Inc.  McCurry does not, however, appear to challenge CNS, Inc.'s (and later CNS, LLC's) rights to enforce the agreement.  *Compare* Defendants' opening memorandum at 17 *with* Plaintiffs' memorandum at 14, n. 5.

[5]  In their memoranda, the Individual Defendants refer to two other form documents which were signed by two of the Individual Defendants at some time after Duratek's purchase of CNS, LLC (discussed below).  Defendants argue that these agreements do not expand the scope of any earlier agreement.  As Plaintiffs have not addressed this argument, the court assumes that they concede this issue.  Similarly, the court declines to consider agreements allegedly signed by Rowland in 1979 and 1983 as these agreements were not referenced in or attached to the Second Amended Complaint.  *See* Plaintiffs' memorandum at 7; Second Amended Complaint ¶ 53 (referring to and attaching agreements signed by Rowland in 1997, 2000 and 2001).

[6]  The relevant provisions of both forms are quoted in the Discussion section of the order.

5

Defendants is set forth in the table below:

| Defendant | form used – when signed | date left CNS, LLC | last day of one year non-compete period |
|-----------|-------------------------|--------------------|-----------------------------------------|
| Tracy Barker | A – 7/90 | 5/14/99 | 5/14/00 |
| James Braun | B – 6/92 | 8/27/99 | 8/27/00 |
| Mike Mohundro | A – 9/90 | 10/11/99 | 10/11/00 |
| Kelly McCurry | A – 5/90 | 10/22/99 | 10/22/00 |
| Cam Abernethy | B – 4/97 | 6/25/00 | 6/25/01 |
| Carl Rowland | B – 1990's[7] | 3/2/01 | 3/2/02 |
| Sharra Arnold | A – 8/85 | 2/19/02 | 2/19/03 |

**Duratek's Purchase of CNS, LLC.** On or about March 29, 2000, Duratek[8] entered an agreement to purchase "all of the membership interest in" CNS, LLC from Waste Management Inc. (WMI). Plaintiffs' memorandum at 2 & exhibit 1.[9] The purchase was completed on or about June

---

[7] This agreement is attached as Exhibit E to the complaint. The year in the date over Rowland's signature appears to be 1997. The year in the date over the signature of the employer's representative is unclear, but appears to be either 1990 or 1993. The specific date is, however, of little consequence.

[8] Duratek was then known as GTS Duratek, Inc.

[9] Plaintiffs' exhibit 1 consists of a number of documents including a purchase agreement dated March 29, 2000 (Chem-Nuclear No. 59019-79); a June 8, 2000 amendment thereto (Chem-Nuclear No. 59080-86); and an extensive disclosure letter which is also dated March 29, 2000 (Chem-Nuclear 61995-62057). While these documents appear to relate to the sale of CNS, LLC to Duratek, Plaintiffs have not provided either an affidavit or other evidence adequate to establish a proper foundation. Nonetheless, the court will, for present purposes, accept this extensive exhibit for the limited purpose of establishing the fact of sale, the date of the initial agreement, and the date of the amendment. No other purpose is suggested in Plaintiffs memorandum.

Reliance on these documents for any other purpose would, in any case, be problematic for two reasons. First, the absence of a supporting affidavit leaves open the possibility that the document is not complete. Second, no specific page citations (or quotations) are provided in support of *any* position.

8, 2000.[10]

After completing its purchase of the full membership interest in CNS, LLC, Duratek transferred that interest GTSD Sub IV. This entity is a holding company which is a wholly owned subsidiary of Duratek Services.[11] In connection with the purchase:

> Duratek . . . made the business decision that [CNS, LLC's] former operations, with the exception of the Barnwell waste processing facility, [would be] performed by other parts of Duratek's enterprise, and particularly Duratek Services. This decision was made because the South Carolina legislature passed [legislation] which required the Barnwell facility to become a regulated entity to be monitored by the South Carolia Public Service Commission ("PSC"). To make [CNS, LLC] easier for the PSC to audit, Duratek . . . moved work formerly done by [CNS, LLC] to Duratek Services; however, the contracts ultimately transferred to Duratek Services were not novated over until 2002.

Plaintiffs' memorandum at 2-3.[12] In the absence of any more specific date, which information would

---

[10] In their memorandum in opposition to summary judgment, Plaintiffs state both that the transaction was completed on "May 8, 2000" and "[i]n June of 2000." Plaintiffs' memorandum in Opposition at 2. For present purposes, the court assumes that the reference to a May closing date is a typographical error as all other evidence and argument suggests a June closing date. *See* Plaintiffs' Exhibit 1 at Chem-Nuclear 59080 (Amendment dated June 8, 2000); Martin depos. at 26 (corporate counsel testimony that he believed the transaction closed on June 8, 2000).

[11] While Plaintiffs summarize these transfers in their memorandum, they fail to direct the court to any supporting authority. Such support should have been provided by affidavit or reference to a specific page of a properly authenticated document. Plaintiffs also fail to explain the relationship between Duratek Services and GTSD Sub IV. The court has, however, located the relevant information in the deposition of CNS, LLC's general counsel and related exhibits. *See* Martin depos. at 28-30 & Exhibit 4 (organizational chart).

[12] Although Plaintiffs give no authority for these statements, they are generally consistent with Defendants' statement of facts. Thus, the court accepts the quoted statement as true for purposes of this order to the extent not challenged. Further, while Defendants note that Plaintiffs have failed to provide any evidence as to when contracts and any other relevant rights (*e.g.,* intellectual property rights) were transferred from CNS, LLC to either of the Duratek entities, Defendants do not challenge the premise that CNS, LLC retained the relevant rights until such transfers occurred. Thus, at any given time, at least one of the Plaintiffs retained the rights to enforce contracts and to protect rights to intellectual property.

clearly be within Plaintiffs' control and relates to an element on which Plaintiffs bear the burden of proof, the court assumes that this transfer of operations took place immediately upon Duratek's purchase of CNS, LLC.

**Individual Defendants' Departure from CNS, LLC and Alleged Competition.** The first four Defendants listed in the preceding chart, Barker, Braun, Mohundro, and McCurry, ("Early-Departure Defendants") left CNS, LLC between May and October of 1999.[13]  That is, all four left well prior to Duratek's purchase of CNS, LLC and, therefore, at a time when CNS, LLC performed a broader range of services than operating the Barnwell site.

Defendant AVANTech was formed on May 12, 1999.  *See* Plaintiffs' Exhibit 7 (Articles of Incorporation, filed May 12, 1999).  The Articles of Incorporation list three of the four Early-Departure Defendants as incorporators.  *Id.* (listing Baker, Braun and McCurry).  A later AVANTech document suggests that AVANTech was formed for a purpose which might constitute competition with CNS, LLC's operations as they existed at the time these Defendants left CNS, LLC's employ. *See* Proposal for Niagara Mohawk Power Corp. ("Niagara Mohawk Proposal" dated October 30, 2000 at 1 ("AVANTech was created for the sole purpose of utilizing the talents of our professional staff to advance the wastewater and wet waste technologies utilized in the nuclear industry").

Additional evidence that at least three of the Early-Departure Defendants intended to form a competing company may be suggested by Voit's testimony, given as Rule 30(b)(6) representative of CNS, LLC,  that he was told that another employee had seen Barker, Braun and McCurry meeting together in CNS, LLC's offices on a weekend in the Spring of 1999.  According to Voit, this

---

[13] Defendants Barker, Braun and McCurry left by choice.  Defendant Muhundro was forced to resign.

employee, Hisham Shamkhani, stated that he was "approached by the group and . . . was told that there was a lot of expertise in the company and that there was a desire to go out on their own and perform work in the same areas of business." Voit Rule 30(b)(6) depos. at 27-28.

Shamkhani, by contrast, testified only that he observed a weekend meeting between these three individuals and that he informed Voit of what he observed. Shamkhani depos. at 74. Shamkhani denied speaking with the three or being aware of the nature of their discussion. *Id.* at 73-74. Thus, the court has been presented with no admissible evidence of what was discussed during the meeting.[14]

The court, nonetheless, assumes for present purposes that a reasonable inference may be drawn that the meeting was connected with these same Defendants' formation of AVANTech. Taken together with the statement in the Niagara Mohawk proposal regarding the purpose for which AVANTech was formed, this evidence may be sufficient to establish that these three Defendants formed AVANTech with the *intention* of competing with CNS, LLC and that they did so while all of them were still employed by CNS, LLC. It is not, however, evidence of actual competition during the relevant period.[15]

In the Rule 30(b)(6) deposition of CNS, LLC's representative, Regan Voit testified as follows regarding evidence of actual competition between AVANTech and CNS, LLC (referred to in the

---

[14] Voit's testimony regarding what he was told by a third party is not admissible to prove that the statement made by the third party was true. It may, however, be considered in assessing Voit's knowledge of the purpose of Barker, Braun and McCurry's meeting. Thus, Voit's testimony regarding what he was told about this meeting may be of particular relevance to the statute of limitations defense given that this action was filed more than three years after the latest date on which all three of the Defendants at issue were still employed by CNS, LLC.

[15] The Niagara Mohawk proposal is dated October 30, 2000, more than one year after the last of the four Early-Departure Defendants left their employment at CNS, LLC. It is not, therefore, evidence of actual competition during the one-year post-employment period.

deposition as "LLC") or AVANTech and Duratek Services:

> Q:     Now, does LLC compete with AVANTech?
>
> A:      LLC today does not compete with AVANTech.  Duratek does compete with AVANTech.
>
> Q:     *Did LLC ever compete with AVANTech*?
>
> A:      *LLC provided the services that became Duratek Services after the acquisition in June of 2000.*
>
> Q:     So does that mean that LLC never competed with AVANTech?
>
> A:      *I think that in the early part of 2000, prior to the acquisition, there were some reasons for LLC– well, not Duratek but LLC to be concerned that AVANTech would be competing or was preparing to, at least preparing to compete with Chem-Nuclear, or LLC, as you call it.*
>
> Q:     But that still doesn't answer my question.  And that was, has LLC ever competed with AVANTech?
>
> A:      I do not know of any direct request for quotation that we bid against one. . . another on.

Voit (Rule 30(b)(6) depos. at 7-8 (emphasis added).

Voit also testified that he believed there may have been some competition between CNS, LLC and AVANTech as to the provision of water processing services in early 2000, presumably before Duratek's purchase of CNS, LLC in June 2000.  For example, Voit testified that: "The first recollection that I have of the name AVANTech was in the early 2000 time frame, and it was upon seeing a brochure for services that looked very familiar to the services that [CNS,] LLC was offering."  *Id.* at 22 .  He also testified that "March of 2000 was the first indication of a brochure that started going to customers."  *Id.* at 27.  He did not, however, provide specifics as to the content of the brochure.  *See infra* at 15-16 (discussing additional testimony relating to the brochure).

Eight months passed between the departure of the last of the four Early-Departure Defendants and the departure of Abernethy, who was the next Defendant to leave CNS, LLC. Abernethy left CNS, LLC in late June 2000, shortly after the sale of CNS, LLC to Duratek was complete. His departure, therefore, coincided roughly with CNS, LLC's cessation of services other than those relating to the Barnwell site. Plaintiffs concede, however, that Abernethy was never a direct employee of any Duratek entity.

The remaining two Defendants, Rowland and Arnold, left CNS, LLC in March 2001 and February 2002 respectively. Both, therefore, left well after CNS, LLC ceased providing services other than those related to the Barnwell site. In Arnold's case, the departure may also have been after the 2002 "novation" of contracts referred to in the above quoted section of Plaintiffs' brief.[16] There is evidence that Rowland and Arnold were both aware of the change in ownership of CNS, LLC, and, in fact, signed forms acknowledging a duty of confidentiality owed to Duratek, Inc. or one of its subsidiaries. On the other hand, there is no evidence that either of these Defendants was ever formally transferred from employment with CNS, LLC to either Duratek Services or Duratek, Inc.

**DISCUSSION**

**I.      Third Cause of Action–Breach of Contract (Violation of Non-Competition Provisions).**

The employment agreements at issue were signed in different jurisdictions. There may, therefore, be some dispute as to the law applicable to issues of contract formation, interpretation, and assignability. *Compare* Defendants' opening memorandum at 14 *with* Plaintiffs' memorandum at 9-10 (discussing applicable law in the context of assignability). Plaintiffs concede, however, that

---

[16] As with various other factual statements, Plaintiffs have failed to provide details of the claimed novations or any supporting evidence.

11

South Carolina law governs enforcement at least in some respects.  *See* Plaintiffs' memorandum at 10 (*citing Associated Spring Corp. v. Roy F. Wilson & Avent, Inc.*, 410 F. Supp. 967 (D.S.C. 1976) and *Standard Register Co. v. Kerrigan,* 119 S.E.2d 533 (1961) for the proposition that "South Carolina courts will not enforce agreements that are void as against the public policy of this state").[17] Plaintiffs also expressly concede that "covenants not to compete must be strictly construed against the employer."  Plaintiffs' memorandum at 16 (citing only South Carolina case law).  It is this rule of construction which is dispositive in the present case.

A.     **Defendants Barker, McCurry, Muhondro and Arnold (Form A signatories).**

Defendants Barker, McCurry, Mohundro, and Arnold all signed the employment agreement which the parties refer to as "Form A."  This court will use the same designation.

**Identification of "Employer."**  This form identifies the employer as including both the named employer, effectively CNS, LLC,[18] as well as the named employer's parent corporation "Waste Management, Inc."  This agreement defines the latter as including "Waste Management, Inc., and all of its divisions, subsidiaries or affiliates, as well as the above-named employer [CNS, LLC]" (hereinafter referred to collectively as "WMI").  Form A, ¶ 1.  The agreement provides that "[t]he provisions of this agreement shall be binding upon [the employee] whether . . . employed by the

---

[17]  As Plaintiffs note, in determining whether a covenant not to compete may be enforced, South Carolina courts consider whether the covenant is: (1) necessary for the protection of the employer's legitimate interests; (2) reasonably limited in its operation with respect to time and place; (3) not unduly harsh or oppressive with respect to the employee's ability to earn a livelihood; (4) reasonable from the standpoint of sound public policy; and  (5) supported by valuable consideration. *Sermons v. Caine & Estes Ins. Agency, Inc.,* 273 S.E.2d 338, 339 (1980) (citing *Oxman v. Sherman,* 239 S.E.2d 559 (1961).

[18]  As noted above, CNS, LLC was the survivor of a merger with Chem-Nuclear Systems, Inc. For purposes of this order, the court assumes that all rights previously held by Chem-Nuclear Systems, Inc., under the employment agreements passed to CNS, LLC upon the merger.

12

above-named employer or any other Waste Management company, *or any successor thereto*." *Id.* (emphasis added).

**Non-Competition Provisions.** The provision prohibiting competition during employment and for a limited period after the employment ends reads as follows:

> 4.    I acknowledge that in my employment I am or will be making use of, acquiring or adding to [WMI's] Confidential Information . . . [I]n order to protect [WMI's] Confidential Information . . . I agree as follows:
>
> * * *
>
> (b)    [1] During the term of my employment, or within one year thereafter, [2] I will not directly or indirectly engage in, or become interested in (as an individual, partner, stockholder, director, officer, principal, agent, employee . . . or in any other relation or capacity whatsoever [other than as a minor shareholder of a publicly traded company]) *any business which renders services that compete with services provided by the company of [WMI] by which I was employed* [3] to any customer or account which was serviced by [WMI] during the period that I was employed by [WMI] and [4] which customer or account is located in any area in which duties were assigned to me during the last two years of my employment.

Form A, ¶ 4 (bracketed numbers and emphasis added).

**Defendants' Arguments.** The Individual Defendants who are signatories to Form A raise three primary arguments in favor of summary judgment on the claim that they violated the above quoted provisions of their employment agreements. First, they argue that the above provisions do not inure to the benefit of Duratek or Duratek Services because the Individual Defendants and these two entities are not in privity of contract. Second, they argue that they have not acted in a manner to violate the agreement. Third, they argue that the agreement is too vague to be enforced because it does not define the term "area." Under the facts of this case, the court finds the second argument dispositive as to any claim based on the non-competition agreement. It is not, therefore, necessary to address the other two arguments.

**Absence of Evidence of Prohibited Competition.**    The critical language is found in the second phrase of paragraph 4.b. (designated as "[2]" in the quotation above). This phrase prohibits engaging, directly or indirectly, in *"any business which renders services that compete with services provided by the company of [WMI] by which I was employed."* CNS, LLC is the company which employed these Defendants at the time of their departure. In light of this fact and the required strict construction of the agreement, the only competition which is prohibited is "compet[ition] with services provided by [CNS, LLC]."[19]    Thus, strictly construed, the employment agreement does not prohibit competition with services which were *formerly* provided by CNS, LLC, even if CNS, LLC retains some rights (*i.e.* patent or contract rights) related to those services.[20] As discussed below, however, while there may be evidence that two or three of these four Defendants (Barker, McCurry, Mohundro, and Arnold) planned and prepared to compete with CNS, LLC, there is no evidence that any of them or AVANTech *ever* competed with services being provided by CNS, LLC.

Plaintiffs "submit there is evidence of competition with [CNS, LLC] during the non-competition periods," referring (but not citing) to: "evidence that AVANTech advertised liquid waste processing services in brochures in March 2000" and to evidence of "AVANTech's proposal to Niagra Mohawk dated October 30, 2000, stating that AVANTech was created for the sole purpose

---

[19]  While possibly not the only reasonable interpretation of the language of the agreement, this is the most obvious interpretation. It is, moreover, the interpretation consistent with strict construction of the prohibition. *See Sermons*, 273 S.E.2d at 339 ("restrictive covenants not to compete are generally disfavored and will be strictly construed against the employer").

[20]  The conclusion that competition must be with services provided by CNS, LLC, moots the question of whether Duratek and Duratek Services are in privity of contract with Defendants. In any case, Plaintiffs do not argue that they were in "privity" with Defendants. Instead, they effectively concede that they are not in privity by arguing that they have "standing" as third party beneficiaries to assert the claims.

14

of providing liquid waste processing services."[21]   Plaintiffs suggest no other evidence of prohibited competition.

The October 30, 2000 Niagara Mohawk proposal is not evidence of actual competition at any time prior to that date.  By the end of October 2000, the one year period during which Barker, Muhundro and McCurry were precluded from competing with their former employer had expired.[22] Moreover, by that time CNS, LLC had ceased providing the services at issue.  For both reasons, the Niagara Mohawk proposal is not itself evidence of prohibited competition.  Even if it was evidence of competition, there is no evidence of resulting damages as AVANTech did not win this bid.

This is not to say that the Niagara Mohawk Proposal is of no relevance given that it contains a statement as to the purpose for which AVANTech was formed.  Taken together with the nature of the Niagara Mohawk Proposal and the date of formation of AVANTech, this suggests that AVANTech was formed with the *intent* of competing with CNS, LLC.  While relevant, this is not enough to suggest that competition *actually occurred* during the relevant period.  Actual competition, not intent, is what is prohibited by Form A.

The court, therefore, turns to the evidence relating to an AVANTech brochure allegedly obtained at a trade show in March 2000.  This is a critical time frame as it is before CNS, LLC was purchased by Duratek and, therefore, during a time when CNS, LLC was still providing the type services allegedly covered by the brochure.  Moreover, it is during a time when Barker, Muhundro

---

[21] The actual language in the Niagara Mohawk Proposal is that AVANTech "was created for the sole purpose of utilizing the talents of our professional staff to advance the wastewater and wet waste technologies utilized in the nuclear industry."  *See supra* at 8.

[22] Defendant Arnold did not leave CNS, LLC's employ until 2002.  There is no allegation that she had any connection with AVANTech at the time of the Niagara Mohawk Proposal.

and McCurry were all subject to the one year prohibition on competition.

The difficulty for Plaintiffs is, however, that they have not provided evidence from which a jury might ascertain the actual content of the brochure. What Plaintiffs present is merely their representatives' interpretation and opinion of the content of a brochure which they concede was somehow different from later-obtained brochures but which they cannot clearly distinguish from those later brochures.[23] Several of Plaintiffs' witnesses testified that they obtained an AVANTech brochure from a third party at a March 2000 trade show. They have, however, conceded that they cannot identify the brochure allegedly received at that time. *See Sitsch* depos. at 104-105 (responding to inquiry as to which document "first alerted [CNS,] LLC to the fact that AVANTech . . . [was] using confidential processes" by first identifying a document then conceding that he did not know if it was the document allegedly received in March 2000); *Kirshe* depo. at 192-93 (stating that he received a copy of an AVANTech brochure at the March 2000 Waste Management Symposium from Mohr who, he understood, had received the brochure from a client who, in turn, had allegedly received it from Defendant Barker – also stating that he placed the brochure in his files which are organized by trade show date).

The best evidence offered of the content of the brochure is Voit's testimony that he saw an AVANTech brochure in "the early 2000 time frame" and that it was "for services that looked very familiar to the services that Chem-Nuclear Services, LLC was offering." *See supra* at 10 (discussing Voit testimony). This statement is merely an interpretation of the content of the brochure. It is not

---

[23] Defendants suggest that this evidentiary difficulty stems from confusion over the date when the brochure was first available. That is, Defendants maintain that the first brochure which Plaintiffs could have obtained in the manner they suggest was in March 2001, not March 2000. For present purposes, however, the court must accept Plaintiffs' version of events as true.

sufficient to establish the actual content. Thus, it is insufficient to establish that AVANTech offered services which competed with services offered by CNS, LLC in or around March 2000.[24]

In summary, Plaintiffs have presented evidence sufficient to suggest that Defendants Barker, Muhundro, and McCurry formed an intent to compete with CNS, LLC during a time when actual competition would be prohibited. Plaintiffs have also presented evidence that, in October 2000, these Defendants subsequently offered services which would have been in competition with services CNS, LLC provided had they been offered prior to June 8, 2000. Plaintiffs have not, however, presented evidence sufficient to allow a jury to conclude that these Defendants individually or through AVANTech, actually competed with services provided by CNS, LLC at any time, and most particularly not during a time covered by the non-competition provisions of their employment contracts. Neither have Plaintiffs presented any evidence that they suffered any injury as a result of competition between AVANTech and CNS, LLC.

**B.     Defendants Braun, Abernethy and Rowland (Form B signatories).**

**Non-Competition Provisions.** Defendants Braun, Abernethy and Rowland all signed the employment agreement which the parties refer to as "Form B." This form identifies the employer

---

[24] Defendants have pointed to numerous conflicts between Plaintiffs' witnesses' testimony as to when and how the brochure was received and documentary evidence as to who attended the March 2000 trade show. This evidence suggests that the brochure which Plaintiffs have produced was distributed at a March 2001 trade show and that no similar brochure was available in March 2000. It further suggests that the individuals who allegedly provided an AVANTech brochure to Plaintiffs' witnesses in March 2000 were not present at that trade show. Defendants also point to possible conflicts within the testimony of Plaintiffs' own witnesses. In short, Defendants' evidence suggests that Plaintiffs' witnesses are confused as to the date of receipt of their first AVANTech brochure. The court need not, however, decide whether the alleged conflicts are sufficient to bring the rule of *Barwick v. Celotex Corp.*, 736 F.2d at 960, into play given that the minimal evidence presented by Plaintiffs as to the content of the brochure is not sufficient to raise a genuine issue of material fact, even in the absence of the countervailing evidence.

17

as including both the named employer, effectively CNS, LLC,[25] as well as the named employer's parent corporation "Waste Management, Inc." For most purposes, "Waste Management includes both the parent corporation and "all of its divisions, subsidiaries and affiliates, including the . . . named employer [CNS, LLC]." For purposes of the post-employment non-competition provisions, however, the agreement defines the protected entity "Waste Management" as "any division, subsidiary or affiliate for which I performed duties during the last twelve (12) months of my employment." Form B ¶ 1.a. Thus, for purposes of Form B, the entity against which post-employment competition is prohibited is limited to CNS, LLC. Filling the appropriate entity into the relevant appropriate sections, the non-competition provisions of Form B read:[26]

(a)    I agree that while employed by Waste Management, I will not, directly or indirectly, compete with the business conducted by Waste Management.

(b)    I agree that for a period of twelve (12) months after termination of my employment . . . ;

(i) I will not, within the Restricted Area,[27] accept employment with a competitor of CNS, LLC if such competitor provides or offers to provide competitive products or services to persons who are or were customers of [CNS, LLC] within the Restricted Area; and

(ii)    I will not directly or indirectly sell, attempt to sell, provide or attempt to provide any products or services in competition with those products or services which I sold or provided on behalf of [CNS, LLC] to any person:

---

[25] *See supra* n. 4 (merger of Chem-Nuclear Systems, Inc. and CNS, LLC).

[26] Where this quotation refers to "Waste Management" it means the larger organization as defined in the text. That is, it includes not only CNS, LLC but all other subsidiaries, divisions, and affiliates.

[27] Restricted Area is defined as "the geographic area serviced by any division of Waste Management for which I performed duties during the last twelve (12) months of my employment with Waste Management." Form B ¶ 1.d.

(A)  residing or located within the Restricted Area;

(B)  who was a customer of [CNS, LLC] within the Restricted Area during the last twelve (12) months of my employment; or

(C) to whom I sold, attempted to sell, provided or attempted to provide such products or services during the last twelve (12) months of my employment with [CNS, LLC].

I agree that I will comply with the most restrictive of the provisions specified in subsections (i) and (ii) (A) through (C) which is allowed by applicable state law.  The parties agree that if enforcement of this agreement is sought, the enforcing court should select the most restrictive provisions appropriate under applicable state law.

Form B § 4.b.

**Lack of Evidence of Competition.**  Of the three Defendants who signed Form B, only Braun was one of the Early-Departure Defendants, having left CNS, LLC in August 1999.  For essentially the same reasons discussed above, the court concludes that there is no evidence that Braun accepted employment with an entity which "provide[d] or offer[ed] to provide competitive products or services to persons who are or were customers of [CNS, LLC] within the Restricted Area," within the year following his departure from CNS, LLC.  At most, he went to work for an entity which planned to engage in such competition at the expiration of the one year non-competition period.[28] Thus, there is no evidence that Braun violated subsection (i).

Similarly, no evidence has been presented that Braun "directly or indirectly s[old], attempt[ed] to sell, provide[d] or attempt[ed] to provide any products or services in competition with those products or services which [he] sold or provided on behalf of [CNS, LLC] to any person"

---

[28] For these purposes, the court assumes that the October 2000 Niagara Mohawk proposal supports the inference of an earlier intent which relates back to the date of formation of AVANTech in May 1999.  The actual offer to provide such services (the proposal to Niagara Mohawk) was, however, made more than one year after Braun's August 1999 departure from CNS, LLC.

19

during the relevant one year period following his August 1999 departure from CNS, LLC. Thus, no evidence has been presented to create an issue as to violation of subsection (ii).

The next Defendant to leave CNS, LLC who was a signatory to a Form B agreement was Abernethy, who left CNS, LLC on June 25, 2000, shortly after it was purchased by Duratek. As discussed above, Defendants concede that CNS, LLC transferred operations other than those related to the Barnwell site to other Duratek entities at or near the time of this sale. They have presented no evidence to suggest that the transfer was not immediate. In light of this transfer, it would be hard to conclude that AVANTech and CNS, LLC were "competitors" at the point Abernethy left CNS, LLC, particularly applying a strict construction to this undefined term of Form B. Thus, there is no evidence from which a jury could conclude that Abernethy violated subsection (i) by "accept[ing] employment with a *competitor* of CNS, LLC." The same conclusion necessarily follows for Rowland, who also signed a Form B employment agreement, as he left CNS, LLC in March 2001.

Subsection (ii) arguably covers a broader range of competition. This section promises that the employee will "not directly or indirectly sell, attempt to sell, provide or attempt to provide *any products or services in competition with those products or services which I sold or provided on behalf of [CNS, LLC]* to any person" who falls into one of several categories. Plaintiffs have not, however, presented evidence that either Abernethy or Rowland engaged in activities prohibited by this section.

For the reasons set forth above, the court concludes that there is no evidence that any of the Defendants who signed Form B violated the terms of the non-competition provisions found in Paragraph 4(b) of that agreement. Neither has any evidence been presented that any of them engaged in prohibited competition with any related entity or parent company *while still employed* by CNS,

LLC as is prohibited by paragraph 4(a). It is not, therefore, necessary for purposes of this ruling to determine whether the protections afforded the broadly defined "Waste Management" family of entities was passed to Duratek and its subsidiaries.

**Anti-Raiding Provisions.** Plaintiffs also refer to a provision of Form B which prohibits employees and former employees from encouraging current employees to leave Waste Management.[29] Plaintiffs' memorandum at 13-14. The Second Amended Complaint does not, however, allege violation of this provision. Thus, this provision is not relevant to any claim before the court.

**Conclusion as to Third Cause of Action.** Considered in the light most favorable to Plaintiffs, the evidence is insufficient to create a genuine issue of material fact as to violation of the non-competition provisions of the Individual Defendants' employment agreements. The court, therefore, grants these Defendants' motion for judgment on the Third Cause of Action.

## II.     Fourth Cause of Action–Breach of Contract (Violation of Confidentiality Provisions).

As noted above, the introduction to Defendants' motion suggests that they are seeking summary judgment on Plaintiffs' Fourth Cause of Action which alleges violation of the confidentiality provisions of the employment agreements. *See supra* n. 1. The relevant allegations are not, however, further addressed in the present motion. They are, moreover, the subject of a

---

[29] This provision reads as follows:

(c) I agree that while I am employed by Waste Management and for a period of twelve (12) months after termination of my employment . . . , I will not directly or indirectly hire, or attempt to hire, any employee of Waste Management nor will I encourage any employee of Waste Management to terminate employment with Waste Management.

Form B ¶ 4.c.

separate motion.  This court, therefore, declines to address these allegations in this order.  To the extent the motion addresses the Fourth Cause of Action, it is denied without prejudice.

**III.     Fifth Cause of Action–Breach of Covenant of Good Faith and Fair Dealing.**

Through this cause of action, Plaintiffs allege that the Individual Defendants' employment with AVANTech violated the covenant of good faith and fair dealing inherent in their employment agreements.  More particularly, this cause of action relies on claims that the Individual Defendants misused Plaintiffs' confidential information and accepted employment with a direct competitor.  So construed, this cause of action is interdependent with the allegations of the Third and Fourth Causes of Action.

The Individual Defendants argue that this cause of action is not legally cognizable given their at-will employment status.  Defendants' opening memorandum at 29 (citing *Keiger v. Citgo,* 482 S.E.2d 792 (S.C. App. 1997)).  As to this argument, Plaintiffs concede that the at-will employment status alone does not give rise to a covenant of good faith and fair dealing.  Plaintiffs' memorandum at 23.  Plaintiffs argue, nonetheless, that the covenant applies to the written employment agreements.  *Id.* at 24.  For present purposes, the court will assume without deciding that Plaintiffs are correct in this statement of the law.

Even with this assumption, it appears that the Fifth Cause of Action adds nothing to the preceding two causes of action for violation of the express terms of these agreements.  This is because it rests solely on allegations of violation of the confidentiality and non-competition provisions of the employment agreements.  No more specific allegations are contained in the complaint and no evidence is cited which would suggest a broader reach of this claim.

For these reasons, the court concludes that, to the extent the Fifth Cause of Action rests on allegations of violation of the non-competition provisions of the Individual Defendants' employment

agreements, it fails along with the Third Cause of Action. The court will, however, deny the motion at this time to the extent the Fifth Cause of Action rests on allegations of violation of the confidentiality provisions of the employment agreements.

**IV.     Sixth through Eighth Causes of Action–Conversion, Civil Conspiracy and Intentional Interference with Contract.**

   **A.     Displacement by South Carolina Trade Secrets Act.**

Defendants also move for summary judgment on the sixth through eighth causes of action for conversion, civil conspiracy and intentional interference with contract. Defendants first argue that these claims are merely a restatement of claims actionable under and therefore displaced by the South Carolina Trade Secrets Act, S.C. Code Ann. § 39-8-10 *et seq.* ("SCTSA"). *See generally,* Roger M. Milgrim, *Milgrim on Trade Secrets,* § 1.01[3][a] at 1-146.16 (2004) ("If . . . other claims are no more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation, then dressing those claims up in different clothing is not likely to be found consistent with the preempting dictates of the UTSA.").[30]

The relevant provisions of the statute read as follows: "(A) Except as provided in subsections (B) and (C), this chapter displaces conflicting tort, restitutionary, and other law of this State providing civil remedies for misappropriation of trade secret." S.C. Code Ann. § 39-8-110(A). The exceptions found in (B) and (C) are relevant here only to the extent they preserve "contractual remedies, whether or not based upon misappropriation of a trade secret or protection of a trade secret," and "other civil remedies that are not based upon misappropriation of a trade secret." S.C.

---

[30] Defendants cite a variety of opinions interpreting other state's similar laws to preclude state law tort claims where the subject of the claim is misuse of a trade secret. *E.g., Penalty Kick Management LTD. v. Coca-Cola Company,* 318 F.3d 1284 (11th Cir. 2003) (holding that Georgia's Trade Secrets Act preempts various state law claims where the subject of the claims is a trade secret).

Code Ann. § 39-8-110(B)(1) & (C).  The SCTSA defines "Trade Secret" broadly as

> (a) information including, but not limited to, a formula, pattern, compilation, program, device, method, technique, product, system, or process . . . that:

>> (i) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, and

>> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

> (b) A trade secret may consist of a simple fact, item, or procedure, or a series or sequence of items or procedures which, although individually could be perceived as relatively minor or simple, collectively can make a substantial difference in the efficiency of a proces or the production of a product, or may be the basis of a marketing or commercial strategy.  The collective effect of the items and procedures must be considered in any analysis of whether a trade secret exists and the general knowledge of each individual item or procedure.

S.C. Code Ann. § 39-8-20.

Plaintiffs do not challenge Defendants' general premise that the state law tort claims are preempted to the extent they are merely a restatement of claims actionable under the SCTSA. Plaintiffs argue, however, that the claims are not so limited.

The court has examined the Sixth through Eighth causes of action (state law tort claims) and concludes that many of the allegations are essentially allegations of  misappropriation of trade secrets.[31]  Moreover, while the Second Cause of Action (SCTSA claim) is arguably more narrowly

---

[31]  In their Sixth Cause of Action, Plaintiffs allege that Defendants are liable for the tort of conversion because they misappropriated Plaintiffs' "ownership rights in valuable tangible and intangible properties concerning its business, including, but not limited to, information, materials and methods and processes for treating radioactive waste, customer lists, price lists, technical drawings, technical descriptions and such."  Second Amended Complaint ¶ 69.  Similarly, in the Seventh Cause of Action for civil conspiracy, Plaintiffs allege that Defendants Barker, McCurry and Braun conspired with each other to misappropriate Plaintiffs' trade secrets and other protected confidential information. *Id.* ¶ 77.  Finally, in the Eighth Cause of Action, Plaintiffs allege that

pled, the allegations in the Sixth through Eighth Causes of Action appear to overlap significantly with the allegations of the Second Cause of Action.[32]  These trade secret based allegations should, therefore, be excluded from the state law tort claims.   The court cannot, however, determine at this stage which aspects of the Sixth through Eighth causes of action should be rejected on this basis as neither party has addressed the claims specifically in relation to the relevant statutory language cited above.[33]   The court will, however, address other limits as set forth below.

### B.     Sixth Cause of Action–Conversion.

Defendants also argue that the conversion claim cannot survive as such a claim ordinarily applies only to personal property which is either tangible or represented by something tangible. *Hawkins v. City of Greenville*, 594 S.E.2d 557 (S.C. App. 2004).  Defendants also argue that the claim is precluded because there is no evidence of "alteration of the condition or . . . exclusion of the owner's rights" to use the property allegedly converted.  *Id.*  In short, Defendants argue that the

_____

Defendants utilized Plaintiffs' "confidential information including, but not limited to, customer lists and trade secrets" to solicit business from Duratek Services' prospective customers.  *Id.* ¶¶ 84-84. Plaintiffs further allege that Defendants used their knowledge (or positions) "to improperly obtain trade secret information, proprietary information, technical drawings, technical documents, technology, price lists and other such material, and to direct proposals to prospective customers of Duratek Services." *Id.* ¶ 86.

[32]  In their Second Cause of Action, which  relies expressly on the SCTSA, Plaintiffs allege that they are the "owners and holders of trade secrets including but not limited to confidential processes for treating nuclear waste."  Second Amended Complaint ¶ 42.  They further allege that "Defendants were privy to [Plaintiffs'] trade secrets . . . including, but not limited to, technical drawings, price sheets, and other documents [and] protected confidential information owned by Plaintiffs." *Id.* ¶ 44.  Plaintiffs conclude by alleging that "Defendants willfully misappropriated and improperly used Plaintiffs' trade secrets," thereby causing Plaintiffs damages.  *Id.* at ¶¶ 46-47.

[33]  By separate order, the court has established a timetable for further briefing which may narrow these issues for trial.

heart of Plaintiffs' claims is misuse of information, not "conversion" of it.

In response, Plaintiffs refer to evidence that Defendant McCurry e-mailed CNS, LLC's proprietary information to his home computer prior to his resignation and then deleted numerous files. They also refer to evidence that Defendants are or have been in possession of hard or electronic copies of Plaintiffs' drawings. Conceding that some of this type information might be a trade secret (and, presumably, not subject to a conversion claim in light of the SCTSA provisions cited above), Plaintiffs argue that some of it may "not rise to the level of a trade secret." Plaintiffs' memorandum at 25. Plaintiffs do not, however, suggest that they have been deprived of use of any specifically identified documents or materials.

Under these circumstances, the court concludes that Defendants are entitled to partial summary judgment limiting this claim to allegations that Defendants took a physical thing or physical embodiment of an intangible, thereby depriving Plaintiffs of its use. Further proceedings set forth in an earlier order may further narrow this claim for trial. *See supra* n. 33.

To the extent it might otherwise survive the above ruling, the court further concludes that the claim is time barred to the extent it rests on allegations that McCurry downloaded electronic materials prior to his departure from CNS, LLC. Plaintiffs were aware of this downloading soon after it occurred. *See* Sitsh depos. at 94-94 & Ex. 8 thereto (noting that within a few weeks of McCurry's October 22, 1999 resignation, an employee of CNS, LLC "went through [McCurry's] e-mail" and discovered that he had "e-mailed to himself [documents] that contain[ed] business sensitive information" such as "pricing" and "design data."). This action was filed in February 2003. Thus, Plaintiffs were on notice of the alleged wrongful act more than three years prior to the filing of this action. The present claim is, therefore, barred by the applicable three year statute of

limitations.  *See* S.C. Code Ann. § 15-3-530 (4).

      **C.**      **Seventh Cause of Action–Civil Conspiracy.**

      As noted above, the only specific allegation in the conspiracy claim is that Defendants Barker, McCurry and Braun conspired with each other to misappropriate Plaintiffs' trade secrets and other protected confidential information. *Id.* ¶ 77.  Thus, except possibly as to the generically identified "other protected confidential information" aspect, this claim is displaced by the SCTSA.

      In their response, Plaintiffs assert that their "claim for civil conspiracy is based upon the [additional] fact that at least three of the individual defendants met and planned to start a business together specifically to unfairly compete with plaintiffs."  Plaintiffs memorandum at 26.  Plaintiffs further allege a conspiracy to hide the fact of the planned competition.

      As discussed in a preceding section, there is evidence from which a jury could conclude that these three Defendants formed AVANTech with the intent of ultimately providing the type services which CNS, LLC was providing at the time AVANTech was formed.  This is not, however, evidence of a conspiracy for an unlawful purpose *absent showing an intent to begin that competition during the period within which competition was prohibited*.  In other words, to the extent the conspiracy claim rests on an intent to compete, Plaintiffs would have to show the conspiracy was for the purpose not just of competing at some time in the future, but of competing during the period covered by the employment agreements.  No such evidence is offered.  As noted above, the only evidence of actual "competition" with services once performed by CNS, LLC relates to competition which occurred at a time and under circumstances that did not violate the terms of the employment agreements.

      Plaintiffs have also failed to proffer evidence that they suffered special damages as a result of the alleged conspiracy.  *See Vaught v. Waites,* 387 S.E.2d 91 (S.C. App. 1989).  As recognized

in *Vaught*, a plaintiff cannot sustain a conspiracy cause of action where that claim is simply an embellishment of the plaintiff's breach of contract claim and does not allege any special damages caused by the conspiracy itself.

For the reasons set forth above, the court concludes that Defendants are entitled to summary judgment on the Seventh (conspiracy) cause of action.[34]

### D.     Eighth Cause of Action–Intentional Interference with Contract.

Defendants argue that the Eighth cause of action for intentional interference with prospective contract is preempted by the SCTSA. Plaintiffs respond that the SCTSA does not preempt the claim because it rests on alleged misstatements found in Defendant AVANTech's bids in competition with Plaintiff Duratek Services for contracts with PSEG (Hope Creek) and Entergy (Grand Gulf and Riverbend). Specifically, Plaintiffs assert that Defendants improperly interfered through a variety of false statements as to Defendants' experience and product equivalence and by misuse of confidential pricing and other information. Plaintiffs' memorandum at 28.[35]   Plaintiffs have presented no evidence that any alleged misrepresentations caused any Plaintiff to lose and Defendant AVANTech to win any specific contracts. Thus, the court grants summary judgment to the extent

---

[34] Defendants also argue that Plaintiffs are time barred from asserting a conspiracy claim based on Voit's testimony that he learned in the spring of 1999 that Barker, Braun and McCurry were seen meeting in the office on the weekend and had approached another employee stating that there was "a lot of expertise in the company and [they] desire[d] to go out on their own and perform work in the same areas of business . . . ." Voit (Rule 30(b)(6) deposition) at 27-28. While Voit's testimony raises serious statute of limitations concerns, the court will assume for present purposes that testimony relating to these Defendants' subsequent assurances raise an issue of fact as to this defense.

[35] Only the misuse of pricing information allegation is clearly predicted by the allegations in the Second Amended Complaint. Defendants do not, however, suggest any concern as to fair notice in their reply. The court assumes this is because the allegations have been made clear by some other means.

this claim rests on allegations of misrepresentations.  There is, by contrast, evidence Defendants may have misused confidential information in pursuing the contracts identified in these claims (Hope Creek, River Bend and Grand Gulf).  The court will, therefore, allow this claim to proceed to the extent it is limited to these allegations of misuse of confidential information and subject to further briefing as addressed in the separate post-hearing order.  The claims will also be limited to the allegations set forth in Plaintiffs' response.

     **IT IS SO ORDERED.**


                              s/ Cameron McGowan Currie
                              CAMERON MCGOWAN CURRIE
                              UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
June 28, 2005

         C:\temp\notesB0AA3C\03-441 & 442 vlv CNS partial sj mo -- non compete and state law claims.wpd